IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DOUGLAS C. BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 05-494 |
| | ) |
| JO ANNE B. BARNHART, | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM ORDER

CONTI, District Judge

*Introduction*

Pending before the court is an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "defendant") denying the claim of Douglas C. Brown ("plaintiff") for disability insurance benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 423, *et seq.*  Plaintiff contends that the decision of the administrative law judge (the "ALJ") that he is not disabled, and therefore not entitled to benefits, should be reversed because substantial evidence shows that plaintiff is disabled, the ALJ's findings are clearly erroneous, and he should be awarded past and ongoing disability benefits.  Defendant asserts that the decision of the ALJ is supported by substantial evidence.  The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  Because the ALJ's decision is supported by substantial evidence, the court will grant defendant's motion for summary judgment and will deny plaintiff's motion for summary judgment.

*Procedural History*

Plaintiff filed the application at issue in this appeal on May 13, 2003, asserting that he became disabled and therefore unable to work on January 4, 2003 due to fibromyalgia and Chronic Fatigue Syndrome ("CFS"). (Record ("R.") at 75-78.) His application was denied at the initial level (R. at 60-63), and he then filed a request for a hearing. (R. at 64-65.) On June 4, 2004, the ALJ held a hearing. (R. at 28-56.) Plaintiff appeared at the hearing, with counsel present, and testified. (R. at 30-50.) A vocational expert ("VE") also testified. (R. at 50-56.) In a decision dated November 16, 2004, the ALJ determined that plaintiff was not disabled and therefore not entitled to benefits. (R. at 15-21.) Plaintiff timely requested a review of that determination and by letter dated February 14, 2005, the Appeals Council denied the request for review. (R. at 7-9.) Plaintiff subsequently commenced the present action seeking judicial review.

*Legal Standard*

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits. 42 U.S.C. § 405(g). This court must determine whether there is substantial evidence which supports the findings of the Commissioner. 42 U.S.C. § 405(g). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" Ventura v. Shalala, 55 F. 3d 900, 901 (3d Cir. 1995)(quoting Richardson v. Perales, 402 U.S. 389 (1971)). This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla." Burns v. Burnhart, 312 F. 3d 113, 118 (3d Cir. 2002). This standard, however, does not permit the court to substitute its own conclusions for that of the fact-finder. Id.; Fargnoli v. Massonari, 247 F.3d

34, 38 (3d Cir. 2001)(reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry).

### *Plaintiff's Background and Medical Evidence*

On May 13, 2003, when he was fifty-seven years of age, plaintiff filed an application for disability benefits. (R. at 75-78.) In the disability report signed by plaintiff on May 10, 2003, he alleged that his fibromyalgia and CFS limited his ability to work. (R. at 86.) Specifically, he stated in the report that his limitations preclude him from performing his current job as a truck driver in compliance with the Federal Motor Carrier Safety Regulations, which provide, in relevant part:

> No driver shall operate a motor vehicle...while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle.

49 C. F. R. § 392.3. In his disability report signed on May 13, 2003, plaintiff stated that he stopped working as a truck driver because "I just couldn't work any longer because of being so tired." (R. at 96.) During a field office interview on May 13, 2003, the interviewer observed that plaintiff had no difficulty with concentrating, sitting, standing, walking, or using hands. (R. at 103.) At that time, plaintiff reported taking Imipramine® to help with sleep irregularity. (R. at 91.)

### a. **Plaintiff's Complaints and Daily Activities**

On June 10, 2003, on a daily activities worksheet, plaintiff complained that his pain and fatigue prevented him from leaving his home on average twenty days out of the month. (R. at

184.) Plaintiff reported no serious difficulty with bathing, shaving, dressing, eating, using or getting to the toilet, caring for others, visiting people, or shopping. (R. at 185.) Plaintiff complained that severe pain prevented him from going places, recreating, doing hobbies, and attending group activities such as church or clubs. (Id.) Plaintiff also complained of serious difficulty with standing, walking, lifting, carrying, pushing/pulling with his hands and legs, grasping, traveling, understanding, remembering, carrying out instructions, concentrating, and "working productively, all day, every day, year round." (R. at 186.)

On June 23, 2003, in responses to a daily activities questionnaire, plaintiff reported that pain and fatigue constantly interfered with his ability to accomplish daily activities, and that on "bad days," his pain and fatigue prevented him from completing daily activities. (R. at 105-09.) On "bad days," plaintiff reported that he is unable to prepare meals for himself, cut the grass on a riding lawnmower, take out the trash, complete small home maintenance tasks, or drive a car. (Id.) He stated that he is able to complete such tasks on other days, but that they cause fatigue, and that his symptoms generally worsen between 1:00 p.m. and 3:00 p.m. (R. at 105.) He stated that he is always able to complete personal care activities such as shaving, showering, and making his bed, but that he must rest while doing so. (R. at 106, 108.) Plaintiff reported that fatigue prevents him from walking for more than five minutes without stopping, and from climbing more than seven steps. (R. at 107.) He reported being able to lift and carry a maximum of five pounds at a time. (R. at 107.) Plaintiff identified no problems with sitting or with using his hands. (R. at 106.) On this questionnaire, plaintiff reported taking no medications. (R. at 105.)

At the June 4, 2004, hearing before the ALJ, plaintiff testified that he was fifty-seven years old, that he received an associate degree in science after two years of college, and that he lives with his wife and his thirty-year-old daughter. (R. at 31-32.) Plaintiff said his primary complaint was fatigue, but he also reported "a lot of pain in [his] arms, legs, back, neck, [and] shoulders," as well as low-grade fevers. (R. at 32, 38, 47.) In addition, plaintiff complained of diarrhea, constipation, and problems with constant urination, that his stomach is "always upset," and that "it's just hard for [him] to get around." (R. at 32.) When asked by the ALJ to describe his typical day, plaintiff testified that on some days he "can't do anything at all," and that some days he "can do a little bit" of his daily activities. (R. at 35.) He complained that his elbows hurt when he lifts more than 10 pounds, and that his fingers are "very sore," causing him to sometime drop what he is holding. (R. at 36.) The most severe pain he experiences, according to his testimony, originates in his buttocks and radiates outwards down the back of his legs. (R. at 37.) He further explained that the pain in other areas of his body is of the same type, though less severe. (Id.) Plaintiff identified "[m]oving around a lot" as the primary aggravator of his pain and fatigue symptoms, and said that he must sit down after ten minutes of walking, and can last somewhat longer if he is doing a stationary task. (R. at 38.)

When asked by the ALJ to describe how he gets the best relief from his pain, plaintiff said he takes an over-the-counter pain reliever such as ibuprofen or Naproxen®, sometimes two or three times per day. (R. at 37-38.) He also said that he began taking vitamins to combat the fatigue, but that he cannot afford the other herbs and remedies that have been recommended to him by his doctors. (R. at 39.)

### b. Medical Evidence

#### (I) Physicians

The record includes reports by three physicians between January 2003 and June 4, 2004, the date of the hearing before the ALJ. Dana Brown, M.D., a Renaissance Family Practice physician, treated plaintiff twelve times – ten times between January 2003 and June 2003 (R. at 118-29, 195-96), once in October 2003 (R. at 193-94), and once on May 4, 2004. (R. at 192.) John G. Hipps, M.D., an environmental and occupational medicine specialist, saw plaintiff for a two-hour physical exam on June 10, 2003, and for follow-ups on August 23, 2003, and September 4, 2003. (R. at 160.) Michael Vogini, D.O., performed a consultative examination of plaintiff on August 18, 2003. (R. at 141-45.)

#### (A) Dana Brown, M.D.

Dr. Dana Brown, plaintiff's treating physician and no relation to plaintiff, opined that plaintiff's complaints of fatigue and pain were likely caused by fibromyalgia, CFS, or a combination of both. (R. at 125, 126.) Dr. Brown consistently found that plaintiff was in no acute distress during his visits, (R. at 120, 122, 124, 126, 129, 192, 194-95), and that plaintiff's elbows, shoulders, knees and back had a general tenderness affecting range of motion. (R. at 120-22, 124-26, 192, 194.) Dr. Brown consistently found that plaintiff was neurologically intact (R. at 123, 128, 192, 194), was without edemas or palpable masses (R. at 120-22, 125, 128, 192, 194), and had good passive range of motion in his joints (R. at 125, 194-95), but that he experienced pain when he extended and rotated his arms without assistance. (R. at 125-26, 195.)

On February 5, 2003, Dr. Brown prescribed Lodine®, an anti-inflammatory drug, to combat plaintiff's muscle aches. (R. at 124.) On February 26, 2003, Dr. Brown reported that the

6

Lodine® "takes the edge off of the muscle aches, but [plaintiff] still has a lot of pain in his hips, shoulders, elbows and hands." (Id.)  Plaintiff stopped taking Lodine® sometime before his check-up with Dr. Brown on March 10, 2003, because it did not improve his symptomology.  (R. at 123.)  Plaintiff was also prescribed the anti-depressant Paxil®, but he did not begin the drug because his insurance would not cover it.  (R. at 124.)  On February 26, 2003, Dr. Brown prescribed Prozac® to combat depression related to his fatigue (R. at 124), and increased the daily dosage from 20 mg daily to 40 mg daily on March 13, 2003.  (R. at 122.)  Plaintiff discontinued using Prozac® on or around April 29, 2003 because he could no longer afford it, and reported that he "did not notice much of a difference [between taking and not taking the Prozac®] although he does feel slightly more fatigued."  (R. at 121.)  On October 22, 2003, Dr. Brown opined that given plaintiff's diagnosis of fibromyalgia and CFS, he "would be best suited on an anti-depressant," but plaintiff did not resume Prozac® use.  (R. at 192, 193-94.)  On March 10, 2003, Dr. Brown started plaintiff on Imipramine®, another anti-depressant, and on May 27, 2003, Dr. Brown increased his daily dosage from 10 mg to 25 mg.  (R. at 120, 123.)[1]

     Dr. Brown concluded on February 13, 2003, that plaintiff "certainly couldn't do his present job [as a truck driver] based on his . . . symptoms," (R. at 125) and continued to impose work restrictions on plaintiff throughout 2003.  (R. at 121-25.)  The only other conclusion made by Dr. Brown regarding plaintiff's ability to work is found in notes following plaintiff's April 29, 2003, visit: "From a work standpoint I still feel he is unable to return to his regular activities.  Certainly if they could find deskwork [sic] for him that might be reasonable with intermittent

---

[1] It is unclear from the record when or why plaintiff discontinued using Imipramine®.

higher physical activity demands but certainly he cannot do his regular work based on his present symptomology." (R. at 121.)

### (B) John G. Hipps, M.D.

John G. Hipps, M.D., conducted a comprehensive evaluation of plaintiff's state of health and potential limitations on his daily living activities. (R. at 130-40, 159-91.) While Dr. Hipps wrote several prescriptions for plaintiff, plaintiff sought Dr. Hipps for the primary purpose of providing a more comprehensive diagnosis of plaintiff's CFS and fibromyalgia. (R. at 160.) Dr. Hipps attributed plaintiff's complaints of pain and fatigue to multiple causes. Specifically, Dr. Hipps opined that plaintiff's chronic pain was secondary to diagnoses of generalized myofascial (musculskeletal) pain, fibromyalgia, ankylosing spondylitis[2] and degenerative arthritis of spine; and that plaintiff's chronic fatigue was secondary to multiple joint pains, myofascial pain, fibromyalgia, sleep deprivation, postural hypotension, EBV positive for previous infection, hypothyroidism,[3] and hypoglycemia.[4] (R. at 170.) The only "medical signs" listed by Dr. Hipps

---

[2] "Ankylosing spondylitis" is defined as "[a] chronic progressive inflammatory disorder that, unlike other rheumatological diseases, affects more men than women." Taber's Cyclopedic Medical Dictionary 2053 (20th ed. 2005). "It involves primarily the joints between articular processes, costovertebral joints, and sacroiliac joints. . . ." Id. "Changes occurring in joints are similar to those seen in rheumatoid arthritis." Id. "Ankylosis may occur, giving rise to a stiff back (poker spine)." Id. "Nonsteroidal anti-inflammatory drugs and physical therapy are the primary forms of treatment." Id.

[3] "Hypothyroidism" is defined as "[t]he clinical consequences of inadequate levels of thyroid hormone in the body." Taber's Cyclopedic Medical Dictionary 1056 (20th ed. 2005). "When thyroid deficiency is long-standing or severe, it results in diminished basal metabolism, intolerance of the cold temperatures, fatigue, mental apathy, physical sluggishness, constipation, muscle aches. . . ." Id.

[4] "Hypoglycemia" is defined as "[a]n abnormally low level of glucose in the blood, often associated with neurological side effects and arousal of the sympathetic nervous system." Taber's Cyclopedic Medical Dictionary 1049 (20th ed. 2005).

to support these diagnoses was "persistent, reproducible muscle tenderness and weakness." (R. at 171.)

When describing the course of illness, Dr. Hipps suggested that plaintiff's symptoms may be aggravated in part by a stressful home life. Dr. Hipps noted that plaintiff's pain and fatigue complaints seemed to coincide with the construction of an addition onto his house in May 2001 and that "[t]he symptoms alternately appeared when back into the home and disappeared when on the road, during a three-week trial at living in his sister's home and during a vacation time." (R. at 162.)

Dr. Hipps reported that plaintiff complained of approximately eighteen "bad days" in an average month, (R. at 162), which is consistent with plaintiff's responses to a questionnaire provided by Dr. Hipps that asked plaintiff to categorize all days into three groupings, good, fair, and bad. (R. at 184.) Plaintiff reported on that questionnaire that he had fourteen "fair days" per month, defined as days where "you function with serious difficulty and fail to complete some living and home care activities," and six "bad days" per month, defined as days where "you function very poorly and fail to complete most living and home care activities." (Id.)

Dr. Hipps concluded that plaintiff:

> [I]s not capable of performing gainful employment. He cannot be expected to present himself at a workplace at a given time, for any given day, for any significant time, to accomplish a task in a quality, timely and safe manner because of the serious limitations and distractions of his chronic pain, chronic fatigue, neurocognitive dysfunction, sleep deprivation, and combined other symptoms necessary to function as an employee each day as required for a regular workweek.

(R. at 172.)

**(C) Michael Vogini, D.O.**

On August 18, 2003, Michael Vogini, D.O., performed a consultative examination of the plaintiff. (R. at 141-145.) The physical exam showed that plaintiff had mild swelling in several joints, mostly in the wrists and fingers, and that the muscles in his shoulder, upper back, and legs, along with his biceps and triceps, were tender when pressed. (R. at 142-43.) Dr. Vogini also reported that plaintiff was neurologically intact and had full motor strength, normal reflexes, a slow but normal stride, and no focal neurological deficits. (R. at 143.)

Dr. Vogini opined that plaintiff was occasionally able to lift twenty-five pounds, was able to stand/walk for one hour in an eight-hour day, and was able to sit for eight hours in an eight-hour workday with alternating sitting and standing. (R. at 145.) Dr. Vogini further opined that occasionally plaintiff was able to perform postural movements, such as bending, kneeling, stooping, crouching, balancing, and climbing (R. at 144), and that his motor strength was 5/5 but easily fatigues. (R. at 143.) Dr. Vogini noted that plaintiff was on no medication at the time of the evaluation. (R. at 142.)

**(ii) Evaluations and other reports**

On April 22, 2003, plaintiff received a functional work capacity evaluation from UPMC Center for Rehab Services ("UPMC Rehab") (R. at 209-14.) Additionally, plaintiff's medical records were reviewed on August 25, 2003, by Jay N. Newberg, M.D. (R. at 146-55.)

UPMC Rehab summarized the results of the evaluation as follows: "Client demonstrated the ability to perform functional ambulation at 2MPH for 10 minutes and stopped secondary to patient's complaints of fatigue. Client stopped the majority of testing secondary to client's complaints of diffuse body pain." (R. at 210.) Out of twenty exertional tests administered by

UPMC, plaintiff was noted as achieving the goal of the exercise only twice.  (R. 211-12.) Despite plaintiff's failure to complete more than two of the exertional tests administered, UPMC Rehab records reflect that plaintiff's physical demand category was medium.  (R. at 209.)

Jay N. Newberg, M.D., reviewed plaintiff's records and concluded on August 28, 2003, that the plaintiff's subjective complaints of pain "do not receive a great deal of support in his physical findings, so his statements about muscle pain and fatigue are felt to be only partially credible."  (R. at 154-55.)  Dr. Newberg opined that the record demonstrated that plaintiff was occasionally able to lift fifty pounds, frequently able to lift twenty-five pounds, stand or walk for six hours in an eight-hour workday, and sit for six hours of an eight-hour workday.  (R. at 147.)

### *Discussion*

Under Title XVI of the SSA, a disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A). Similarly, a person is unable to engage in substantial gainful activity when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ."  42 U.S.C. § 1382c(a)(3)(B).

In order to make a disability determination under the SSA, a five-step sequential evaluation must be applied.  20 C.F.R. §§ 404.1520, 416.920.  The evaluation consists of the following stages: (1) whether the claimant is currently engaged in substantial gainful activity; (2)

if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) if not, whether the claimant's impairment prevents him from performing his past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of his age, education, work experience and residual functional capacity. 20 C.F.R. §§ 404.1520, 416.920; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000). If the plaintiff fails to meet the burden of proving the requirements in the first four steps, the administrative law judge may find that the plaintiff is not disabled. Burns v. Burnhart, 312 F.3d 113, 119 (3d Cir. 2002). The Commissioner is charged with the burden of proof with respect to the fifth step in the evaluation process. Id.

In the instant case, the ALJ found: (1) plaintiff has not engaged in substantial gainful activity since the alleged onset of disability on January 4, 2003; (2) plaintiff suffers from CFS and fibromyalgia, which are severe; (3) these impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff cannot return to any past relevant work; and (5) there were jobs in the national economy that plaintiff could perform. (R. at 20.)

Plaintiff urges that substantial evidence did not support the ALJ's determination that the plaintiff was not disabled. Specifically, plaintiff argues that the ALJ erroneously ignored the opinion of Dr. Hipps and the testimony of the VE when the ALJ structured his third hypothetical in a way that substantially mirrored the conclusions of Dr. Hipps, and the VE testified that a person so situated would be unable to work. Defendant argues that substantial evidence supports the ALJ's decision.

### a. Whether the ALJ erred in ignoring plaintiff's claims of not being able to work several days during a month, a limitation which was included in the third hypothetical

During the hearing held on June 4, 2004, the ALJ posed three hypotheticals to the VE. (R. at 28-56.) The three hypotheticals were roughly modeled upon the conclusions reached by Drs. Newberg, Vogini, and Hipps.

The first hypothetical, tracking the opinion of Dr. Newberg, asked the VE to assume an individual of claimant's age and education level and past work experience with limitations including a maximum lifting of 50 pounds, repeated maximum lifting of 25 pounds, and the ability to stand, sit and walk each six hours out of an eight-hour day. (R. at 52.) The ALJ asked the VE whether this individual could return to prior relevant work. (Id.) The VE responded: "Such an individual would be able to perform a number of jobs with those limitations . . . they would include, but not be limited to those all janitorial work . . . food preparation jobs . . . [and] clerking jobs." (R. at 52-53.)

The second hypothetical, tracking in part the opinion of Dr. Vogini, asked the VE to assume:

> [A]dditional limitations. Here the maximum lifting is reduced to 20 pounds, repeated maximum lifting to 10 pounds. Standing is limited to one hour out of an eight-hour day. Sitting can be performed up to eight hours out of an eight-hour day. But walking is also limited to only one hour out of an eight-hour day. And, as well, this individual should only occasionally bend, stoop, kneel, crouch, balance or climb. How would that change the vocational picture?

(R. at 53.) The VE responded:

> Such an individual would be limited to what we classify as sedentary work . . . because of the requirement for walking no more than one hour in an eight-hour day. . . . Such an individual would be able to perform the job of a cashier . . . a clerk . . . [or] packaging jobs.

13

(R. at 53-54.)

  The third hypothetical, tracking the opinion of Dr. Hipps, asked the VE to assume:

> All the limitations given so far continue to apply . . . [h]ere the maximum lifting is reduced to 10 pounds, the repeated maximum lifting is reduced to five pounds. This individual would need a sit/stand option. As well, **this individual experiences fatigue and experiences bad days about one-half of all working days per month.** And during these kinds of days the individual would experience fatigue and **would need to rest or sleep three hours out of every eight-hour daytime period**. How would that change the vocational picture?

(R. at 54) (emphasis added). The VE responded that "[i]t would change the vocational picture to the point that an individual so limited, your Honor, would be unable to perform any jobs in the national economy on a sustained, competitive basis." (R. at 55.)

  Plaintiff argues that it is unreasonable to assume that the ALJ asked the third hypothetical without a belief that it did not accurately characterize plaintiff's situation. This argument has no merit. It is well-established procedure for an administrative law judge to "proffer a variety of assumptions to the expert" during a hearing. Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). The ALJ in the decision found that plaintiff had only the limitations included in the first hypothetical. The testimony of the VE in response to any hypothetical may be considered for the purpose of determining a disability *only* if "the question accurately portrays the claimant's individual physical and mental impairments." Id.; see Wallace v. Secretary, 722 F.2d 1150, 1155 (3d Cir. 1983) (when the hypothetical does not accurately portray the nature and extent of the impairment of the impairment, this "renders the vocational expert's testimony deficient"). Thus, when the ALJ made the final determination as to plaintiff's ability to work, the ALJ was not bound by testimony proffered by the VE in response to hypothetical limitations that the ALJ found, after considering all the evidence, to be inaccurate.

### b. **Whether the ALJ erred in failing to weigh properly the opinion of Dr. Hipps**

Plaintiff also argues that the ALJ erred in failing to give proper weight to the medical determination of Dr. Hipps, who opined that plaintiff would be unable to work several days during an average month. When a conflict in the evidence exists, an administrative law judge may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993). An administrative law judge must consider all the evidence and give some reason for discounting the evidence she rejects. See Stewart v. Sec'y of Health, Educ., and Welfare, 714 F.2d 287, 290 (3d Cir. 1983). Here, the ALJ did not err in disfavoring Dr. Hipps' opinion because it conflicted with substantial objective evidence, i.e., the opinions of other examining and treating physicians. 20 C.F.R. § 404.1527(d)(2).

The third hypothetical, which the ALJ apparently modeled around the opinion of Dr. Hipps, assumed that plaintiff could lift 10 pounds maximum, and repeatedly lift five pounds, would need a sit/stand option at work, could only work half of all working days per month, and during the day, would need to rest or sleep three or four hours out of every eight-hour daytime period. (R. at 54.) The ALJ stated that he did not find that these limitations accurately reflected plaintiff's condition because they were "not supported by the objective medical evidence." (R. at 18.)

While Dr. Hipps' reports support plaintiff's assertion that he is precluded from working without significant limitation, Dr. Hipps' reports often give the impression of simply recording plaintiff's complaints, which undermines the objective basis of those reports. (R. at 164, 171, 175-91.) The only objective medical observations which are not based on plaintiff's self-reports

noted by Dr. Hipps as a basis for the primary diagnoses of CFS and fibromyalgia were "persistent, reproducible muscle tenderness and weakness." (R. at 171.) CFS and fibromyalgia are difficult to diagnose, in part because no laboratory test presently exists to determine their presence or absence. See Kurilla v. Barnhart, No. Civ. A.04-1724, 2005 WL 2704887, at *3 (E.D. Pa. Oct. 18, 2005) (quoting Sarchet v. Chater, 75 F.3d 305, 306-07 (7th Cir. 1996) ("[F]ibromyalgia is a difficult disease to diagnose due to the fact that there are no laboratory tests for the presence or severity of 'fibromyalgia'. . . [t]he principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and - the only symptom that discriminates between it and other diseases of a rheumatic character - multiple tender sports, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.")); Mitchell v. Eastman Kodak Co., 910 F.Supp. 1044, 1050 (M.D. Pa. 1995) ("Chronic Fatigue Syndrome is a debilitating immunological disorder which is frequently difficult to diagnose. The illness consists principally of a cluster of symptoms exhibited over a period of time.").

In this case, while Drs. Brown, Vogini and Newberg all agreed that plaintiff suffered from CFS and fibromyalgia, only Dr. Hipps opined that these conditions were severe enough to prevent plaintiff from working at any job.[5] For example, Dr. Brown, plaintiff's primary care physician, concluded that, based upon the objective medical evidence, plaintiff could perform some type of work, (R. at 121), which contradicts the opinion of Dr. Hipps that plaintiff was incapable of working at least several days during an average month. (R. at 172-73.) By reason

---

[5]An opinion that a plaintiff can do no work is essentially reserved for the Commissioner. "A statement by a medical source that [a plaintiff is] . . . 'unable to work' does not mean that [the Commissioner] will determine that [the plaintiff is] disabled." 20 C.F.R. § 404.1527(e)(1).

of Dr. Brown treating plaintiff twelve times between January 2003 and May 2004, Dr. Brown developed a longitudinal picture of plaintiff's impairment, and the ALJ did not err in giving Dr. Brown's opinion more weight than the opinion of Dr. Hipps.  20 C.F.R. § 414.1527(d)(2)(i).  Drs. Vogini and Newberg concurred with the conclusion of Dr. Brown.  (R. at 145, 147-50.)  Plaintiff's functional evaluation, conducted by UPMC Rehab reflected that plaintiff had a medium work capacity.  (R. at 209.)

   The record provides several additional examples of conflicts between the opinion of Dr. Hipps, plaintiff's consulting physician, and the opinion of Dr. Brown, plaintiff's treating physician.  Dr. Hipps based his finding of hypothyroidism and hypoglycemia, respectively, on an uptake scan and a three-hour glucose test.  (R. at 171.)  When asked by plaintiff to review the accuracy of these diagnoses, Dr. Brown suggested that the hypothyroidism diagnosis was a result of a "poor test" and was likely a "false positive" because other relevant laboratory tests showed no evidence of a thyroid problem.  (R. at 192-93.)  Dr. Hipps prescribed Synthroid® for the hypothyroidism diagnosis, which Dr. Brown said was actually making plaintiff feel worse than before.  (R. at 192-93.)  Dr. Brown also questioned the hypoglycemia result, because while the blood work was consistent with the diagnosis, plaintiff had "no symptoms that are consistent" with hypoglycemia.  (Id.)  Dr. Brown further stated that it was not understood why Dr. Hipps prescribed Doxycycline® for the plaintiff.  (R. at 193.)  Dr. Brown also disagreed with Dr. Hipps' diagnosis of ankylosing spondylitis, (R. at 194), although Dr. Brown suggested that plaintiff undergo a rheumatologic evaluation to "confirm [the diagnosis of ankylosing spondylitis] and contradict myself."  (Id.)

Contradictions also exist between the clinical notes and the formal report of Dr. Hipps. While Dr. Hipps recorded in his clinical notes that plaintiff has no neurocognitive problems with concentration, comprehension, word-finding, and calculations (R. at 138), Dr. Hipps contradicted this finding in his formal report, where he stated that plaintiff in fact has significant trouble with these nonexertional activities. (R. at 163.) Plaintiff reported during his field office disability report of May 13, 2003, that he had no problems with concentrating, understanding, coherency, or answering questions. (R. at 103.) In response to Dr. Hipps' questionnaire, plaintiff said that he had "serious difficulty" on a "sustained basis" with understanding, remembering, carrying out instructions, and concentrating. (R. at 186.) The records of Dr. Brown do not corroborate the formal conclusion of Dr. Hipps with regard to alleged nonexertional limitations on plaintiff's ability to accomplish work-related or daily life activities.

Plaintiff's reliance on Kangas v. Bowen, 823 F.2d 775 (3d Cir. 1987), is unavailing. In Kangas, the administrative law judge ignored otherwise uncontested evidence that the plaintiff required frequent and often prolonged periods of hospitalization, which would significantly interfere with his ability to keep a job. Id. at 778. Here, plaintiff never required hospitalization for his symptoms, and Dr. Hipps is the only physician, treating or otherwise, to opine that plaintiff would be completely unable to work for significant periods of an average month. Rather than erroneously ignoring uncontested, objective medical evidence, the ALJ considered plaintiff's entire medical record and did not err in the weight he afforded the opinion of Dr. Hipps which was contradicted by the opinions of the other treating and examining physician, as well as by the UPMC Rehab functional evaluation.

*Conclusion*

Based upon the evidence of record, the parties' arguments and supporting documents filed in support and opposition thereto, this court concludes that substantial evidence supports the ALJ's finding that plaintiff is not disabled. The decision of the ALJ denying plaintiff's application for DIB is affirmed.

Therefore, plaintiff's motion for summary judgment (Docket No. 5) is **DENIED**, and defendant's motion for summary judgment (Docket No. 8) is **GRANTED**.

**IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against plaintiff, Douglas Brown.

The clerk shall mark this case as closed.

By the court:

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated: August 15, 2006

cc: counsel of record